Patricia T. **OULTON, as Executive Director of the Buffalo Psychiatric Center; Buffalo Psychiatric Center: Bruce E. Feig, as Acting Commissioner of the New York State Office of Mental Health; Office of Mental Health of the State of New York; and the State of New York, Plaintiffs,**

v.

Otis **BOWEN, Secretary of Health and Human Services of the United States; United States Department of Health and Human Services; Health Care Financing Administration of the United States Department of Health and Human Services; William Roper, Administrator, Health Care Financing Administration; and Annemarie Schmidt, Director, Survey and Certification Operations Branch, Division of Health Standards and Quality, Health Care Financing Administration, Defendants.**

No. CIV–87–1238C.

United States District Court,
W.D. New York.

Nov. 19, 1987.

As Amended Feb. 18, 1988.

Robert Abrams, Atty. Gen. of the State of N.Y. (Douglas S. Cream, and Andrew Lipkind, Asst. Attys. Gen., of counsel), Buffalo, N.Y., for plaintiffs.

Department of Health and Human Services (Robert Wanerman, Asst. Regional Counsel, Office of General Counsel), New York City, and Roger P. Williams, U.S. Atty. (Denise E. O'Donnell, Asst. U.S. Atty., of counsel), Buffalo, N.Y., for defendants.

CURTIN, Chief Judge.

On September 29, 1987, this court granted plaintiffs' motion for a temporary restraining order to prevent defendants from terminating the participation of the Buffalo Psychiatric Center [BPC] in the federally funded Medicare Program (Item 6). By stipulation, the parties agreed to extend the temporary restraining order until October 20, 1987, to afford the court an opportunity to consider the jurisdictional issues raised by defendants in their filings (Item 10). At oral argument on October 20, this court reserved decision on defendants' motion to dismiss on jurisdictional grounds and directed that the restraining order remain in effect until further order of this court (Item 20). On October 30, 1987, this court heard oral argument on plaintiffs' motion for a preliminary injunction.

Plaintiffs say that a preliminary injunction is necessary to avoid irreparable harm 1) to BPC's ability to hire and retain profes-

sional staff; and 2) to BPC's ability to maintain the confidence of its patients and their families necessary for successful treatment. Plaintiffs also state that they are likely to succeed on the merits of the action because of defendants' failure to provide BPC with a reasonable opportunity to cure the alleged deficiencies prior to termination as required by statute and regulation. 42 U.S.C. § 1395cc(b)(2); 42 C.F.R. § 405.1901, *et seq.; see especially* 42 C.F.R. § 405.1907. They maintain that, because the balance of hardships in this case tips decidedly in their favor, they are entitled to preliminary relief from this court.

Defendants dispute this view. Further, they argue that this court lacks jurisdiction over the subject matter of this case and that plaintiffs' Amended Complaint (Item 11) should therefore be dismissed. Alternatively, they argue that the facts show that plaintiffs are not entitled to preliminary relief.

The relevant procedural and factual history of this dispute may be summarized as follows. BPC became a provider of services in the Medicare program effective March 6, 1967. In 1985, BPC underwent a Health Care Financing Administration [HCFA] survey which was done by HCFA's authorized agent at that time, the New York State Department of Health. As a result of that survey, BPC was informed by letter on June 3, 1985, that it was out of compliance with the special staff requirements condition because of a finding that it had an insufficient number of nurses and psychologists on staff. *See* 42 C.F.R. § 482.62. At that time, BPC was invited to formulate a plan of correction with a reasonable timetable. Item 24, attached June 3, 1985, letter of Robert C. Braun. BPC subsequently did so and was informed that it was in compliance with all conditions of participation. At no time during 1985 did HCFA threaten the BPC with termination from the Medicare program as a result of deficiencies.[1]

---

1. In his October 28, 1987, affidavit, BPC's Director of Administration Richard Parnell says that the 1985 survey also uncovered deficiencies with respect to a) the quality of social work

assessment, b) the frequency of entry of process notes into patients' files, and c) activity therapy on evenings and weekends (Item 24, ¶¶ 6–8). None of these deficiencies were apparently con-

The evidence indicates that in 1986, the BPC was considered by HCFA to be in compliance with the special staffing and medical records conditions of participation in the Medicare program, although some lesser deficiencies were noted.[2] Again, HCFA did not threaten the BPC with termination.

In 1986, the Department of Justice [DOJ], a second federal agency, also became involved with the BPC in order to investigate possible civil rights violations at the institution. *See* Civil Rights of Institutionalized Persons Act [CRIPA], 42 U.S.C. § 1997, *et seq.* By letter dated February 27, 1987, the DOJ notified the State that its investigation had uncovered conditions at the BPC which allegedly deprived patients of their constitutional rights. Since that time, the DOJ and the State have engaged in discussions regarding the DOJ's findings.

On June 29, 1987, after learning of the DOJ's findings of unconstitutional conditions, a team of HCFA investigators arrived at the BPC to conduct a "surprise survey." *See* Item 26, Affidavit of Marion Gosnell [Gosnell Affidavit]. The results of this survey became available to the plaintiffs by letter dated July 30, 1987.[3] Based on its review of the information gathered by its investigators, HCFA informed plaintiffs that the BPC no longer met two special conditions required to continue its participation in the Medicare program. *See* 42 C.F.R. §§ 482.61–62; *see also* Item 17, Affidavit of Annemarie Schmidt [Schmidt Af-

fidavit], ¶ 12.[4] This letter also noted that BPC's participation as a provider of services would be terminated effective October 1, 1987, and that an administrative hearing to review this decision could be requested. Schmidt Affidavit, ¶ 13, Exh. B. The State subsequently requested such a hearing by letter dated August 31, 1987. *Id.*, Exhs. D and E. Thereafter, the State submitted to HCFA a plan of correction and a request that the scheduled date of termination be postponed. *Id.*, ¶ 17, Exh. F. This request was denied on September 25, 1987, based on HCFA's view that a plan of correction is insufficient to demonstrate compliance. *Id.*, ¶¶ 16–187, Exh. G. Thereafter, plaintiffs commenced this lawsuit.

In her affidavit, government attorney Denise E. O'Donnell alleges that this court does not have subject matter jurisdiction over this action pursuant to the statutory authorities asserted by plaintiffs [O'Donnell Affidavit] (Item 14). *See* 28 U.S.C. §§ 1331, 2201, 2202; 42 U.S.C. §§ 1395, *et seq.*[5] *See also* Items 13, 15, 16, 17, 26, and 31.

Given the above, defendants say that the only possible basis for this court's jurisdiction in the instant case is 42 U.S.C. § 1395ff(c), which allows district courts to review final decisions of the Secretary of Health and Human Services as provided in 42 U.S.C. § 405(g). Section 405(g) says in pertinent part:

> Any individual, *after any final decision of the Secretary made after a hear-*

---

sidered to constitute violations of a condition of participation in the Medicare program.

**2.** In 1986, treatment planning records were challenged. Item 24, ¶¶ 9–10.

**3.** Prior to this, on July 15, 1987, the investigators sent the results of its inspection to HCFA.

**4.** Examples of deficiencies include:
 a. The hospital does not provide an adequate number of psychiatrists, psychologists, nurses, or physicians.
 b. The staffing pattern of RN coverage does not insure the availability of a registered professional nurse 24 hours each day.
 c. In 41 of 66 records reviewed, the documentation of the neurological exam was minimal and not considered adequate.

d. Psychiatric evaluations were incomplete, inconsistent, and often lacking relevant information.
 e. The mental status exam was absent in all records from the alcohol treatment program (eight records reviewed), and of uneven quality in other records.
 f. The long-term treatment goals were usually not observable, measurable, rarely written in behavior terms, and not always relevant.
 g. The same treatment modalities were used for all patients and were not individualized nor specific.

**5.** In plaintiffs' reply (Item 18), they withdraw their assertion that this action also arises under 42 U.S.C. §§ 1983 and 1988, as well as the Fifth and Fourteenth Amendments to the United States Constitution. *See also* Item 21.

*ing to which he was a party,* irrespective of the amount in controversy, may obtain a review of such decision by a civil action commenced within sixty days after the mailing to him of notice of such decision or within such further time as the Secretary may allow.

(Emphasis added.)

Based on this language, defendants argue that this court lacks subject matter jurisdiction to review the Secretary's termination decision until such time as the BPC has exhausted its administrative remedies. *Northlake Community Hospital v. United States,* 654 F.2d 1234 (7th Cir.1981). Defendants argue that plaintiffs cannot show that they have exhausted insofar as they admit in paragraph 45 of their Amended Complaint (Item 11) that they have applied for appropriate administrative relief. Accordingly, defendants say that plaintiffs' only available avenue of relief at this time is to pursue their administrative appeal pursuant to 42 C.F.R. § 405.1501, *et seq.*

In plaintiffs' reply (Item 19), they maintain that this court has jurisdiction over the subject matter of this case at this time, arguing that a decision by the Secretary can be "final" within the meaning of 42 U.S.C. § 405(g) by either 1) completion of the available administrative review procedures; or 2) judicial waiver of the exhaustion requirements in appropriate circumstances. *City of New York v. Heckler,* 742 F.2d 729 (2d Cir.1984), *aff'd sub nom. Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986). Plaintiffs contend that they have satisfied the exhaustion requirement for present purposes because they have presented compelling circumstances for a judicial waiver of exhaustion. Plaintiffs state their position:

> A central claim in the action, articulated in the complaint, request for TRO, and on the pending motion for preliminary injunction, is that the defendants failed to provide BPC with an ample and reasonable period in which to cure the alleged deficiencies. The plaintiffs have exhausted this claim, even though they have not completed all of the interme-

diate steps of review within HHS. The plaintiffs have received what is essentially a final decision from the Secretary on this question.

Item 19 at p. 3.

Plaintiffs assert that this claim constitutes an appropriate subject for a judicial waiver of administrative exhaustion by this court. Relying on *City of New York v. Heckler, supra* at 746, they say that further administrative review of the question of whether or not they have been provided with an ample and reasonable time in which to cure alleged deficiencies would be "futile" because defendants have already denied plaintiffs' request for such time. Moreover, plaintiffs argue that their central claim is sufficiently "collateral" to the question of whether or not the BPC is entitled to participate in the Medicare program to satisfy the requirements of the *City of New York* case. Finally, they argue that the requirement of further administrative exhaustion of this claim is likely to cause irreparable harm to BPC's efforts to remedy any alleged deficiencies such that a judicial waiver of this requirement is entirely appropriate.[6]

Defendants' attorney disagrees. In a letter dated October 30, 1987, she contends that this court should reject plaintiffs' argument that the section 405(g) exhaustion requirement can and should be waived in this case. She argues:

> Should plaintiffs prevail on that theory, any party could similarly circumvent the exhaustion requirements in Section 405(g) of the Social Security Act merely by alleging that its construction of the relevant statutes and regulations differs from that of the Secretary. Not only would this approach result in an overburdening of this Court's docket, it would not permit the administrative review process to function in the proper manner. *See Weinberger v. Salfi,* 422 U.S. 749, 765 [95 S.Ct. 2457, 2466, 45 L.Ed.2d 522] (1975). Plaintiffs' approach also ignores the well established rule that an administrative agency's construction of its own regulations is entitled to substantial def-

---

**6.** *See, e.g.,* Item 22, Affidavit of Ella A. Curry; Item 27, pp. 5–11.

erence. *See Lyng v. Payne* [476 U.S. 926], 106 S.Ct. 2333, 2341–2342 [90 L.Ed. 2d 921] (1986) (and citations therein). In brief, plaintiffs' argument would permit an exception to the general rule favoring exhaustion of administrative remedies to swallow the rule itself.

Item 31, pp. 1–2. Finally, defendants' attorney contends that the cases cited by plaintiffs are inapposite here.

As is set out in the defendants' papers, Title XVIII of the Social Security Act [the Act] establishes a program of Federal Health Insurance for the Aged and the Disabled, commonly known as the Medicare program. 42 U.S.C. §§ 1395–1395zz. Medicare provides insurance coverage to qualified beneficiaries for certain medical expenses, including inpatient psychiatric hospital services (42 U.S.C. §§ 1395c, 1395x(c) and 1395x(f)), which is completely funded by the federal government and is administered by the Secretary of Health and Human Services [the Secretary]. 42 U.S.C. § 1395d. Pursuant to his authority, the Secretary also has promulgated regulations applicable to the operation of the Medicare program.

With the exception of certain emergency services, the Medicare program requires that covered services to eligible individuals, in order to be reimbursable by Medicare, must be furnished by a "provider of service." 42 U.S.C. § 1395f; 42 C.F.R. § 405.150. A "provider of service," for purposes of the Medicare program, is a term of art and is specifically defined at 42 U.S.C. § 1395x(u) as a "hospital, skilled nursing facility, comprehensive outpatient rehabilitation facility, home health agency...." In the context of this case, a facility such as BPC is a "psychiatric hospital" within the meaning of the Medicare Act only if it meets the appropriate criteria and conditions established by Congress and the Secretary at 42 U.S.C. §§ 1395x(f) and 42 C.F.R. §§ 482.11–.62 (1986). If a facility does not fulfill all of the provisions set forth in the pertinent statutory and regulatory authority, and as further outlined in appropriate manuals and guidelines for a

"psychiatric hospital" provider of services, then such facility is not, for purposes of the Medicare Act, a psychiatric hospital within the meaning of federal law. Thus, a facility may not enter into a provider agreement allowing for Medicare reimbursement, nor may an existing provider agreement continue, if the appropriate Medicare requirements and criteria for such an institution are not met. 42 U.S.C. § 1395cc, 42 C.F.R. §§ 489.1–.66 (1986).

Upon acceptance into the Medicare program, a provider becomes responsible for, *inter alia*, remaining in compliance with the terms of the agreement and the provisions of Title XVIII of the Act and regulations promulgated thereunder. 42 U.S.C. § 1395cc; 42 C.F.R. §§ 489.1–.66 (1986). 42 C.F.R. § 489.10 (1986) describes the "basic requirement" of a provider agreement and states in relevant part as follows:

(a) Any of the providers specified in Sec. 489.2 may request participation in Medicare. In order to be accepted *it must meet—(1) The conditions of participation set forth elsewhere in this chapter....*

(Emphasis added.) This requirement is restated in 42 C.F.R. §§ 405.1901–.1913, which discusses "Certification Procedures for Providers and Suppliers of Services." 42 C.F.R. § 405.1901(b) (1986) states that a prospective Medicare provider must, for present purposes, 1) meet the applicable statutory definition in section 1861 of the Act, and 2) be in compliance with the applicable conditions. Put another way, a Medicare provider must meet the statutory definition of a psychiatric hospital, and comply with all conditions of participation, 42 U.S.C. § 1395x(f)(2). According to 42 U.S.C. § 1395cc(b)(2)(B), the Secretary may terminate a provider agreement for failure to comply with these requirements.

In the instant case, defendants have decided to terminate the BPC from the Medicare program because they have determined that the BPC has failed to satisfy the "conditions of participation" in the Medicare program. *See* 42 C.F.R. Part 482; *see also* 42

U.S.C. 1395x(e) (referred to in 42 U.S.C. § 1395x(f)(2)). According to the Schmidt affidavit (Item 17, ¶ 7), each of the regulatory conditions of participation are several so-called "standards," which are, in turn, further subdivided into elements or factors.

With respect to psychiatric hospitals like BPC, the Secretary has promulgated two special conditions of participation referring to special medical records and special staffing requirements. *See* 42 U.S.C. § 1395x(f)(3–4); 42 C.F.R. § 482.61–.62. It is BPC's failure to comply with these special conditions of participation which defendants allege is responsible for their termination from the federal Medicare program at this time. *See* Schmidt affidavit, ¶ 12; *see also infra,* note 4.

The Secretary, all parties acknowledge, is responsible for determining whether providers meet and continue to meet the applicable "conditions of participation" and, to do so, has contracted with HCR, a private company which surveys participating state-operated psychiatric hospitals. Schmidt affidavit, ¶ 9. The results of HCR's special survey regarding compliance or non-compliance, however, only constitutes a *recommendation* to the Secretary. It is the Secretary which makes the final determination whether or not the facility continues to be eligible to participate in the Medicare program. 42 C.F.R. §§ 405.1901(b), 489.10 (1986). The defendants argue:

> While some of the program requirements are quantifiable, each level of evaluation requires professional judgment. Deficiencies in some standards may not, in the surveryor's judgment, sufficiently affect the overall condition so as to result in a determination that a condition is not in compliance. On the other hand, one standard may be so crucial that a deficiency in that one area alone may be sufficient cause to find the overall condition not met. If any condition of participation is not met, or if a facility does not comply with. the provisions of Title XVIII, ... any existing [provider] agreement is subject to termination. Section 1866(b) of the Social Security Act, 42 U.S.C. § 1395cc(b); 42 C.F.

R. 489.53(a)(3) (1986); 42 C.F.R. 489.-11(a); 42 C.F.R. §§ 405.1901—405.1913 (1986). *See also* Schmidt Affidavit, Paragraph 7.

Item 16, pp. 9–10.

According to defendants:

> A provider may submit a plan of correction in response to noted deficiencies with respect to one or more *standards* in a condition of participation and continue participation in the Medicare program if the plan is determined to be acceptable in terms of the corrective measures suggested and the time within which such measures will be accomplished. A plan of correction, however, may not serve to continue a facility in the program if an overall condition of participation is out of compliance. 42 U.S.C. § 1395x(f); 42 C.F.R. §§ 405.1901, 405.1903, 405.1907; 42 C.F.R. §§ 489.11 and 489.53. Therefore, compliance with statutory requirements including the hospital conditions of participation afford a facility the opportunity to participation in the Medicare program at the hospital provider level, and failure to comply will result in termination or non-acceptance into the program. *See* Schmidt Affidavit, Paragraph 8.

Item 16, p. 10.

According to the defendants, an initial decision to terminate a facility's eligibility under Medicare takes effect upon the date specified by the Secretary. In addition, the Secretary must give a provider and the public at least 15 days' notice "before the effective date of termination," 42 C.F.R. § 489.53(c) (1986). This notice was clearly given in the instant case on or about July 30 1987, that termination would occur on October 1, 1987. Following termination, both parties concede, a provider like the BPC is entitled to participate in the administrative hearing and review procedures established by 42 U.S.C. § 405; 42 C.F.R. §§ 405.1530–.1561.

Plaintiffs now argue, however, that they are entitled to a judicial waiver of the requirements of administrative exhaustion (42 U.S.C. §§ 405(g), 1395ff(c), and 1395ii),

because of the Secretary's alleged failure to comply with the requirements of its own regulations prior to terminating BPC from the Medicare program.[7]

More specifically, plaintiffs argue that the language of 42 C.F.R. § 405.1907(b) supports their view that they should be given an "ample and reasonable time" to correct their alleged violations of any conditions of participation relating to Special Medical Records and Special Staffing. 42 U.S.C. § 1395x(f)(3–4); 42 C.F.R. § 482.61–.62. Section 405.1907(b) states:

> If it is determined during a survey that a provider or supplier is not in compliance with one or more of the standards, it will be granted a reasonable time to achieve compliance. The amount of time will depend upon the nature of the deficiency and the State survey agency's judgment as to the capabilities of the facility to provide adequate and safe care. Ordinarily a provider or supplier will be expected to take the steps needed to achieve compliance within 60 days of being notified of the deficiencies but the State survey agency may recommend that additional time be granted by the Secretary in individual situations, if in its judgment it is not reasonable to expect compliance within 60 days, e.g., a facility must obtain the approval of its governing body, or engage in competitive bidding.

According to plaintiffs, this regulation is directly applicable in the present case. They argue that the hiring of 56 staff members, including psychiatrists, physicians, nurses, and psychologists, cannot be completed within a 60–day period, and that they have taken every step they reasonably can take to develop and implement a plan to address the deficiencies alleged by defendants. *See* Item 23, Affidavit of Robert Coffey [Coffey affidavit].

Plaintiffs argue that defendants' insistence that they be terminated now violates the above statutory and regulatory requirements that the notice period be reasonable and provide an ample period of time within which to achieve compliance, especially where, as here, certain state-mandated procedures must be followed to obtain authorization for corrective measures to be taken. *Cf., North Lake Community Hospital v. United States, supra* (wherein the United States allowed the hospital approximately eight months to cure its deficiencies, which included, *inter alia,* violation of the National Fire Protection Association's Life Safety Code); *cf.,* Item 25, Affidavit of Sharon D. Flaherty [Flaherty affidavit] (noting no "immediate threat to health and safety" at BPC).[8]

Defendants disagree and say that plaintiffs' reliance on 42 C.F.R. § 405.1907 is

---

**7.** In their papers, plaintiffs also argue that HCFA's determination is part of an illegal attempt to compel the State to enter into a consent decree with the DOJ. *Cf., United States v. Oregon,* 675 F.Supp. 1249 (D.Ore. 1987) (attached as Exhibit F to Item 4). However, because plaintiffs did not pursue this position at length during oral argument, I now decline to address it in the body of my opinion. Moreover, I believe that there is insufficient evidence in the record for plaintiffs to prevail on this claim. *See* Item 33, pp. 39–42.

**8.** On pages 1243–44 of the *Northlake* decision, the United States Court of Appeals for the Seventh Circuit said:

> Title XVIII of the Social Security Act authorizes the Secretary to terminate an agreement with a provider which does not substantially comply with the appropriate conditions of participation. 42 U.S.C. § 1395cc(b)(2) (1979). The deficient provider may temporarily continue to receive Medicare funds, however, if the existing deficiencies do not jeopardize the health and safety of the patients or seriously limit the provider's capacity to render adequate care. *The facility must also submit an acceptable plan for achieving compliance within a reasonable period of time. 42 CFR § 405.1907(a) (1980). Although the provider is ordinarily expected to take steps toward achieving compliance within 60 days of the notice of the deficiency, the time allowed depends upon the nature of the violation and the facility's ability to provide safe and adequate care. 42 CFR § 405.1907(b)* (1980). If the Secretary does not approve the provider's plan for achieving compliance or finds that the deficiencies affect the service rendered by the provider and the safety of its patients, the Secretary must give the provider fifteen days notice before terminating the agreement. 42 CFR § 489.53(b)(1) (1980).

(Emphasis added.) *Cf., Mississippi Medicaid Com'n v. U.S. Dept. of Health,* 633 F.Supp. 78, 82–86 (S.D.Miss.1985).

misplaced. Defendants argue at pages 34–35 of Item 16 that:

[i]t is imperative that the regulatory language be read with specific reference to the words of art employed in them. In the case of 42 C.F.R. § 405.1097, the language speaks to allowing a reasonable time to cure deficiencies in a *standard* in a condition of participation, as opposed to a *condition* of participation itself. As discussed, *supra,* a standard is only a component or subset of a condition of participation. *See* Schmidt Affidavit, Paragraph 7. For example, 42 C.F.R. § 482.23, which covers the condition of participation for nursing services, is composed of three standards. By contrast, each condition of participation must be satisfied at all times as a prerequisite to continued participation in the program. In the instant case, BPC was found to be out of compliance with two of the twenty-two conditions of participation it was required to satisfy. 42 U.S.C. § 1395x(f) and 1395cc. The State's misconstruction of the regulations, however, would completely blur the clear distinctions between a standard and a condition of participation. Moreover, the State is asking this Court to ignore this crucial distinction and construe a regulation in derogation of the express statutory language and undercut a well-crafted statutory and regulatory framework, a result that must be avoided.

In their reply, plaintiffs state that defendants' attempt to read the "reasonable time" requirement to only apply where "standards" are not met, but not where a "condition" is involved, is flawed for several reasons. Item 19, pp. 14–16. First, plaintiffs say that such a reading conflicts with the explicit statement made when the regulations were first promulgated and which said that a facility would be terminated from participation after it had been given notice of deficiencies and "ample time to make the necessary improvements." 39 Fed.Reg. 2238.

Second, plaintiffs claim that defendants' interpretation of section 405.1907 would render the regulation meaningless because the regulations only permit a provider to be terminated when it fails to comply with a condition of participation (42 C.F.R. § 405.1905) and *not* for a mere violation of a standard. As such, plaintiffs argue that a provider will *never* need a "reasonable time to achieve compliance" prior to termination in the latter case *because a provider cannot be terminated simply for failure to meet a standard.* Therefore, plaintiffs argue that if section 405.1907(b) is to "mean anything," then:

it must mean that where a provider is out of compliance with a condition—because the facility is deficient in meeting one or more standards in that condition—HCFA must grant the provider a reasonable amount of time to achieve compliance with the standards, and therefore, with the condition of participation itself. Otherwise, this compliance time provision would never be used.

Item 19, p. 15.

Finally, plaintiffs say that defendants' own reading of its regulations indicates that a provider cannot be out of compliance with a condition of participation without also being out of compliance with at least one standard. According to plaintiffs, this means that section 405.1907(b) must be read to apply to both standards and conditions. Defendants disagree with all of these arguments.

After a very careful review of the cases cited by the parties, as well as the facts of this case, I now find that this court has no subject matter jurisdiction over the instant dispute.

As all parties acknowledge, plaintiffs here have not fully exhausted the administrative remedies available to review the Secretary's decision to terminate the BPC from its participation in the federal Medicare program. 42 C.F.R. §§ 405.1501, *et seq.* However, as was noted in the Second Circuit's *City of New York* case,[9] the ex-

9. *See also Stieberger v. Heckler,* 615 F.Supp. 1315, 1329–30 (S.D.N.Y.1985); *State of New York v. Heckler,* 105 F.R.D. 118, 112–23 (S.D.N.

haustion requirement can be "waived" in certain circumstances by the Secretary or the court. The Second Circuit said:

[t]he Supreme Court has adopted a practical approach to section 405(g)'s exhaustion requirement. The Court has approved judicial waiver where plaintiff's legal claims are collateral to the demand for benefits, where exhaustion would be futile, or where the harm suffered pending exhaustion would be irreparable. *Compare Mathews v. Eldridge*, [424 U.S. 319, 330–32, 96 S.Ct. 893, 900–01, 47 L.Ed.2d 18 (1976)] (exhaustion waived), with *Heckler v. Ringer*, [466] U.S. [602], 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984) (exhaustion not waived).

Although *Eldridge* and *Ringer* make clear the circumstances that permit a court to waive exhaustion, they do not establish whether each of the individual factors deemed relevant in those decisions—futility, collaterality, and irreparable harm—must be present before a court may dispense with exhaustion. In the absence of express guidance, we have taken the view that no one factor is critical. *See Smith v. Schweiker*, 709 F.2d 777, 780 (2d Cir.1983). We have adopted a more general approach, balancing the competing considerations to arrive at a just result under the circumstances presented....

742 F.2d at 736.

In the instant case, plaintiffs argue that the issues they raise in their papers justify a judicial waiver of the administrative exhaustion requirement, primarily because of the alleged irreparable harm the BPC would suffer if defendants are permitted to terminate the facility from the Medicare program. As was stated above, plaintiffs essentially rely upon their claim that the Secretary has failed to comply with its own regulations prior to terminating BPC from the Medicare program. *See* 42 C.F.R. § 405.1907(b) (requiring that a Medicare provider be given a "reasonable time" in which to achieve compliance).

While I believe that this issue may be "substantially collateral" to the question of BPC's right to continued participation in the Medicare program, as well as the kind of question that would be "futile" to challenge on the administrative level (*City of New York v. Heckler*, 742 F.2d at 737), plaintiffs have failed to convince this court that it should exercise subject matter jurisdiction. There are essentially two reasons for my decision, which will be summarized below.

First, plaintiffs cannot show the kind of irreparable harm which would justify this court's involvement at this time. Unlike the *City of New York* case and many of the other cases cited by plaintiffs in their papers, plaintiffs in the present case are not individuals with disabling health problems who will suffer grave consequences if this court does not exercise jurisdiction. Instead, plaintiffs here are persons and entities which have both 1) considerable financial resources at their disposal, and 2) the serious responsibility to make certain that the standards and conditions at the BPC are met so that proper treatment and care is afforded all BPC patients.

As was summarized above, in late July 1987, plaintiffs were informed that the BPC was out of compliance with two conditions of participation in the Medicare program, as well as the fact that, absent compliance, the BPC would be terminated from that program as of October 1, 1987. *Cf.*, 42 C.F.R. § 489.53(c) (requiring a provider be given "at least 15 days [notice] before the effective date of termination of [a] provider agreement"). While plaintiffs thereafter made considerable efforts to complete the required hiring necessary in order to satisfy the defendants that the BPC could be brought back into compliance in a timely fashion, they simply could not do all the required hiring before October 1. In oral argument before this court on October 30, 1987, plaintiffs stated that the bulk of this hiring has, in fact, been completed.[10]

As the defendants' attorney, Denise O'Donnell, has made clear in her papers

Y.1985); *Fox v. Bowen*, 656 F.Supp. 1236 (D.Conn.1987).

10. Item 33, pp. 17–20.

and in open court, if the plaintiffs believe that the BPC, or part of the BPC, is back in conformance with the applicable conditions of participation, they may request a re-survey from the Secretary at any time with respect to all of part of the facility. In addition, defendants note that payment for inpatient hospital services rendered to beneficiaries will continue to be made for 30 days following the date on which the termination is effectuated. Item 17, Exh. B.

Having said all of the above, I now find that plaintiffs' claim that the BPC would be seriously harmed if this court permits the defendants to terminate it from the Medicare program without first affording plaintiffs additional time to correct its alleged deficiencies to be entirely speculative, *cf.*, Item 33, pp. 32–35. As defendants' attorney stated at oral argument on October 30, 1987, while it may be true that the hiring process may make the termination more difficult by some measure for plaintiffs, it is impossible to say at this time that the impact of the termination would result in irreparable injury. In the instant case, BPC is a facility which, because of its close relationship with the State of New York, has the capacity to seek additional funding to correct its deficiencies, to hire the necessary qualified personnel it needs, and then to reapply to participate in the Medicare program. As such, I believe that the loss suffered by plaintiffs by termination at this juncture would be primarily a financial one. Put another way, as representatives of the State, plaintiffs will be forced to pay the operational costs incurred at the BPC which have been previously paid by the federal government until such time as the facility is back in compliance with all conditions of participation. Because I find that this does not amount to irreparable harm, this court should not entertain jurisdiction.

In addition to the above, I also find very persuasive defendants' argument that the present dispute is not the kind of dispute over which this court should properly be involved. As both parties acknowledge,

plaintiffs' view that they should be afforded an ample and reasonable time in which to correct the BPC's deficiencies is essentially a question of *statutory interpretation* which should be left to the Secretary's sound discretion. *See Califano v. Sanders*, 430 U.S. 99, 108–09, 97 S.Ct. 980, 985–86, 51 L.Ed.2d 192 (1977); *Bowen v. City of New York, supra*, 476 U.S. 467, 106 S.Ct. at 2031–32. *But see Reed v. Heckler*, 756 F.2d 779, 784–85 (10th Cir.1985). As defendants argue, an agency's construction of its own regulation is properly entitled to substantial deference. *Lyng v. Payne, supra*, 106 S.Ct. at 2341–42. Were this not the case, any disgruntled health care provider would be able to circumvent the carefully drawn administrative review process merely by taking issue with a single regulation. Because I believe that Congress did not intend this result, I find that, under the present set of facts, this court must decline to exercise subject matter jurisdiction over this dispute.[11]

Plaintiffs' motion for a preliminary injunction is denied. Defendants' motion to dismiss is granted. Plaintiffs' complaint is dismissed in all respects.

So ordered.

---

**11.** I concur with defendants that this court has no jurisdiction over the instant dispute pursuant to 28 U.S.C. §§ 1331, 1361, 2201, or 2202.